UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NICOLE AHLSCHLAGER,

                Plaintiff,

              v.

JOHN IMHOF, in his official capacity as
Commissioner of the Suffolk County Department
of Social Services,

                Defendant.
-----------------------------------------------------------X

**PRELIMINARY INJUNCTION ORDER**
24-CV-8267 (OEM) (JMW)

ORELIA E. MERCHANT, United States District Judge:

      Plaintiff Nicole Ahlschlager ("Plaintiff") brings this action under Title II of the Americans with Disabilities Act ("ADA") seeking injunctive relief and compensatory damages from John Imhof, in his official capacity as Commissioner of the Suffolk County Department of Social Services ("SCDSS"). Now before the Court Plaintiff seeks a mandatory preliminary injunction directing SCDSS to immediately permit her to have her service dog with her at the homeless shelter operated by SCDSS, where she and her family currently reside. Complaint ("Compl."), ECF 1, at 1. For the following reasons, Plaintiff's motion for a preliminary injunction is GRANTED.

## BACKGROUND

      Plaintiff and her family—her common law husband, Joshua Goodman ("Plaintiff's husband"), and two minor children—have been residing at a Suffolk County shelter, Workforce Development Center ("WDC"), since being evicted from their home in September 2024. Compl. ¶¶ 20-22. Plaintiff and her family live in a room on the second floor of the shelter. *Id.* ¶ 23.

      Plaintiff suffers from cerebral palsy and various mental health afflictions. *Id.* ¶ 10; Declaration of Tamar Lavy, M.D. ("Lavy Decl."), ECF 5-7, ¶ 4; Ahlschlager Affidavit

1

("Pl.'s Aff."), ECF 5-9, ¶ 4. Approximately two and a half years ago, Plaintiff obtained a service dog. Compl. ¶ 17. Plaintiff's children named her service dog "Nightmare" after the dog in the movie "The Nightmare Before Christmas." Pl.'s Aff. ¶¶ 4-5. Plaintiff requires use of the service dog primarily to help with instability and balance when walking, due to her cerebral palsy. *Id.* ¶ 6. The dog also helps with her anxiety, depression and other mental health symptoms, which Plaintiff asserts are exacerbated by her physical condition. *Id.* ¶¶ 9-11; Compl. ¶ 19. She alleges that prior to receiving the dog, she fell fifteen times, including once where she hit her head. Pl.'s Aff. ¶ 7. Plaintiff claims she went to the hospital multiple times after these falls—in part because her severe anxiety caused "catastrophic thinking" that led her to believe that she had serious injuries. Lavy Aff. ¶ 6; *see* Pl.'s Aff. ¶ 8.

Plaintiff says that when she arrived at the shelter in late September 2024, WDC refused to permit her service dog. Compl. ¶ 25-26. After a few days, SCDSS provided authorization for Plaintiff to keep her service dog at the shelter as an ADA accommodation. *Id.*; *See* Affidavit of Joshua Goodman ("Goodman Aff."), ECF 5-11, ¶¶ 4-5.

A few weeks later, on or about October 21, 2024, an incident occurred when Plaintiff's husband was returning to the shelter with Nightmare. It was captured on video. *See* ECF 16. The video shows Plaintiff's husband and Nightmare ascending an outdoor stairwell towards a doorway at the top of the stairs. As he reaches the top step, someone opens the door outwardly towards Plaintiff's husband and Nightmare. Plaintiff has identified this individual as another shelter resident named "Gabby." Compl. ¶ 29. At the moment the door begins to open, Nightmare is seen looking down the stairwell. When it opens further, Nightmare lunges and jumps up towards Gabby, whose figure can be partially seen through a window within the doorframe. There is no bite visible on the video. SCDSS has not argued otherwise and admits a case manager did not

2

witness the alleged bite. *See* Hearing Rough Transcript ("Tr."), Dec. 10, 2024, at 22:12-16. Plaintiff and her husband assert that "at no time did the dog bite Gabby and at no time when this incident occurred did Gabby assert that she was bitten, and that Gabby said something to the effect of 'it's not a big deal, it just scared me.'" Compl. ¶ 30-32; Goodman Aff. ¶ 11. Plaintiff states that Gabby sent a photo of her hand over text message which showed no bite marks. Pl.'s Aff. ¶ 15; Exhibit A to Pl.'s Aff., ECF 5-10. SCDSS maintains that Nightmare bit Gabby and underscores that SCDSS determined that Nightmare posed a risk to shelter residents. *See* Defendant's Memorandum in Opposition ("Def.'s Opp."), ECF 12, at 9. Neither party has submitted an affidavit of the alleged victim or any other eyewitness to the incident, apart from that of Plaintiff's husband. *See* Goodman Aff.

On October 22, 2024, the day after the incident, Plaintiff asserts WDC informed her that she must immediately remove her service dog from the shelter, without giving her an opportunity to discuss alternative safety precautions. Compl. ¶¶ 33, 36; Pl.'s Aff. ¶ 14. Plaintiff was informed that the decision was made by SCDSS. Compl. ¶ 33. After removing the dog, Plaintiff asserts she suggested to individuals at SCDSS and WDC that the dog be muzzled but that SCDSS rejected this suggestion and did not offer an alternative course of action. *Id.* ¶¶ 37-38. Plaintiff also asserts SCDSS rejected her alternative suggestion that it pay for the family and Nightmare to stay in a hotel or motel separate from other residents. *Id.* ¶ 39. Nightmare is currently staying with Plaintiff's friend. *See* Reply Declaration of Inez Avila ("Avila Decl."), ECF 13-3, ¶ 2.

## DISCUSSION

Plaintiff seeks a mandatory preliminary injunction directing SCDSS to permit her service dog to stay with her at the homeless shelter where she and her family currently reside, or any other shelter where SCDSS may place her. A movant seeking mandatory preliminary injunctive relief

3

must establish: (1) irreparable harm; (2) a clear of substantial likelihood of success on the merits, (3) that the public interest weighs in favor of granting the injunction; and (4) that the balance of equities tips in her favor. *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020); *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).

### A. Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (citations omitted). "To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that absent a preliminary injunction [she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citations omitted).

Plaintiff argues that her reliance on her service dog for assistance, places her at a high risk of irreparable harm. Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction ("Pl.'s MOL"), ECF 5-12, at 8. Plaintiff presents affidavits and records showing that she suffers from a cerebral palsy, relies on her service dog to ambulate more easily and to reduce her risk of falling. *See* Exs. D, ECF 5-5; Lavy Decl.; Pl.'s Aff ¶¶ 4-10. Plaintiff's evidence also demonstrates that she relies on her service dog to alleviate her depression and anxiety symptoms. *See* Lavy Decl.; Pl.'s Aff ¶¶ 4-10. Plaintiff claims that she is now less confidently able to walk, walks less, is at a much higher risk of falling, and has already suffered one fall since her service dog was removed from the shelter. Pl.'s Aff ¶ 20. Finally, Plaintiff argues that she has suffered "significant psychiatric harm." Pl.'s MOL at 8.

4

In opposition, SCDSS argues that Plaintiff cannot establish psychological harm because she "repeatedly violated Rule Number 3 of the Rules and Responsibilities for Service Dogs requiring that her 'service dog must be with her at all times[]'" and that because Plaintiff did not have her dog with her *at every moment*, Plaintiff's claims of psychological harm are insincere.[1] *See* Def.'s MOL at 8. However, SCDSS' granting Plaintiff's request to have a service dog at the shelter, albeit just not Nightmare, is an acknowledgment that SCDSS believes Plaintiff requires use of a service dog.

SCDSS also argues that Plaintiff's damages are pecuniary and not irreparable because her risk of injury could be rectified by simply obtaining a new service animal. Def.'s Opp. at 7 ("Plaintiff has wholly failed to submit" any "evidence of damage that cannot be rectified by financial compensation"). However, Plaintiff asserts that a replacement dog is "not feasible" because of her "significant attachment to [Nightmare]" and because the cost and time to train a new service dog would "pose an undue and significant burden on her." Compl. ¶ 43. Further, Plaintiff's psychiatrist, Dr. Lavy, similarly states that Plaintiff has a "significant attachment" and "feelings of warmth and attachment" towards this service dog, such that forcing her to give up this particular dog "is highly likely, at least initially, if not long-term, to produce feelings of depression and loss." Lavy Decl. ¶¶ 12-13. Dr. Lavy also states that the process of getting a service dog is "too great a burden for a person who carries the psychiatric diagnoses [Plaintiff] has, particularly

---

[1] In response to SCDSS's arguments regarding Plaintiff's violation of the shelter's "Rules and Responsibilities" contract, Plaintiff says this was a contract of adhesion that she signed under duress. Pl.'s Reply at 8. Plaintiff says she made the shelter aware before signing that her husband took the dog for walks and to training, without Plaintiff, and shelter staff told her those trips were permissible. Pl.'s Reply Aff. 3. Importantly, the "Rules and Responsibilities" form that Plaintiff signed, which provided that "Your service dog must be with you at all times", exceeds the scope of the ADA's requirements. Moreover, the fact that Plaintiff signed this form does not exempt SCDSS from the ADA. *See Shapiro v. Cadman Towers, Inc.*, 844 F. Supp. 116, 123-24 (E.D.N.Y. 1994), *aff'd*, 51 F.3d 328 (2d Cir. 1995). "A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted." *Id.* (quoting H.R. Rep. No. 711, 100th Cong., *reprinted in* 1998 U.S.C.C.A.N. 2173).

5

the symptoms of anxiety". *Id.* Dr. Lavy further opines that "the stress caused by the process of getting a new service dog is likely to cause significant psychiatric harm to [Plaintiff]." *Id.* ¶ 13.

The Court agrees with Plaintiff. As an individual suffering from cerebral palsy, Plaintiff is subject to an incurable disease that affects her balance, and causes involuntary movement of her legs, an unsteady gait, and weakness in her arms and legs. Plaintiff's service dog helps her walk more easily, prevents her from falling, and combats symptoms of her various mental health conditions. SCDSS does not dispute this. SCDSS also does not dispute Plaintiff's claims that separation from her service dog has caused her mental health symptoms, including her depression, agoraphobia, and panic disorder, to increase in severity and frequency. Without access to a service dog at her place of residence, Plaintiff is at risk of irreparable harm. *See Shapiro v. Cadman Towers, Inc*, 51 F.3d 328, 331 (2d Cir. 2005) (holding that plaintiff, a disabled individual, was at risk of irreparable physical and mental harm without access to a handicapped parking space at her residence); *see also Parris v. Pappas*, 3:10-CV-1128, 2010 WL 5157326, at *2 (D. Conn. Dec. 14, 2010) (refusal to allow a disabled individual's live-in aid created a risk of irreparable harm, including risk of injury, to plaintiff).

The Court finds that Plaintiff will be irreparably harmed absent the grant of a preliminary injunction allowing her to keep this specific service dog, Nightmare, while she resides in the SCDSS shelter. Without Nightmare, Plaintiff claims that she will suffer an "immense feeling of loss" due to her connection with the dog. *See* Lavy Decl. ¶ 10-12. The human-animal bond a disabled individual shares with their service animal can be central to the services it provides, as Plaintiff asserts here. Both Congress and courts outside this circuit have recognized as much. *See Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004) (public accommodation was required to modify its policies by admitting plaintiff's service animal; in part

6

due to human-dog bond, modification was "necessary" even though plaintiff could be "accompanied by an able-bodied companion, and even though the defendant offered the assistance of specially-trained staff"); *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1087 (N.D. Cal. 2013) (finding separating an individual from his service animal risked irreparable harm and deprived him of independence); *Alboniga v. Sch. Bd. of Broward Cnty, Fla.*, 87 F. Supp. 3d 1319, 1341 (S.D. Fla. 2015) (irreparable harm established where separating service animal from disabled individual "would have a detrimental impact on the human-animal bond"); *Sullivan By and Through Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 961 (E.D. Cal. 1990) ("each day she is forced to be separated from her service dog . . . his usefulness to her is diminished. As a consequence of defendant's conduct, plaintiff's ability to function as an independent person . . . is injured daily."); 135 Cong. Rec. S.10,800 (1989) (statement of Sen. Simon) ("[a] person with a disability and his . . . [service] animal function as a unit" such that separating the two generally "[is] discriminatory under the [ADA]").

Moreover, Plaintiff has shown that Defendant's proposed solution that she purchase a new service dog would not mitigate Plaintiff's irreparable harm because, in the time it would require Plaintiff to obtain and train a new service animal, Plaintiff would be unable to move about her place of residence freely and independently without risking a fall. *See Sunrise Dev, Inc v. Town of Huntington*, 62 F. Supp. 2d 762, 788 (E.D.N.Y. 1999) ("for the period of the delay occasioned by the reapplication process, [plaintiffs] will be unable to live in the residential neighborhood of their choice, while the able-bodied citizens of the Town are free to make that choice.").

### B. Likelihood of Success on the Merits

"For mandatory injunctions, which 'alter rather than maintain the status quo,' such as the one at issue here, 'the movant must show a clear or substantial likelihood of success' on the

7

merits." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).

Plaintiff brings two causes of action under Title II of the ADA, 42 U.S.C. § 12132, claiming that (1) Defendant has not met its burden to exclude the dog under the ADA's regulations pertaining to service animals, 28 C.F.R. § 35.130(b); and (2) Defendant refused to engage in an interactive process to provide Plaintiff with reasonable accommodations for her disability. Compl. ¶¶ 44-48. Plaintiff seeks a preliminary injunction based on the second claim only. *See generally* Pl.'s MOL.

To prevail on her Title II ADA claim for reasonable accommodations, Plaintiff must establish that (1) she is a qualified individual with a disability; (2) SCDSS is subject to the ADA; and (3) Plaintiff was denied the opportunity to participate in or benefit from SCDSS's services, or was otherwise discriminated against, by reason of her disability. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). "In order to 'ensure meaningful access, reasonable accommodations in the [] program[s] or benefits may have to be made.'" *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72-73 (2d Cir. 2016) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Therefore, the third element of the reasonable accommodations test is satisfied if a defendant failed to "'mak[e] reasonable accommodations to the known physical or mental limitations of an . . . individual with a disability.'" *Doe v. U.S. Sec'y of Transportation*, 17-CV-7868 (CS), 2018 WL 6411277, at *7 (S.D.N.Y. Dec. 4, 2018) (quoting 42 U.S.C. § 12112(b)(5)(A)); *accord Wright*, 831 F.3d at 72.[2]

---

[2] The statutory citation is to Title I of the ADA, which pertains specifically to employers: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). However, the Second Circuit has applied this statutory language equally to Title II cases. *See, e.g., Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 186-87 (2d Cir. 2015) (reasonable accommodations required in educational context under Title II). The Appendix to Title II's regulations also makes clear that "[T]itle II entities have the same legal obligations as [T]itle III entities to make

8

The parties do not dispute that Plaintiff is disabled and that SCDSS is subject to the ADA. Nor does SCDSS dispute that Plaintiff has offered a plausible accommodation: placing a muzzle on the service dog. Accordingly, the only remaining issue for the Court to determine is whether Defendant has met its burden of persuasion that the proposed accommodation is unreasonable. *See Dean*, 804 F.3d at 190 (plaintiff bears the burden to suggest a plausible accommodation whereas defendant bears the burden of persuasion that the proposed accommodation is unreasonable).

"The hallmark of a reasonable accommodation is effectiveness." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015). Specifically, a reasonable "accommodation need not be 'perfect' or the one 'most strongly preferred' by the [ ] plaintiff, but it still must be 'effective[.]'" *Id.* Title II of the ADA "requires that an 'individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances[.]" *Wright*, 831 F.3d at 77 (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) and noting that *Martin*, decided under Title III applies equally to Title II). "This is so because the 'refusal to consider [an individual's] personal circumstances in deciding whether to accommodate his disability runs counter to the clear language and purpose of the ADA.'" *Id.*

SCDSS argues that it rightfully removed the service dog pursuant to 28 C.F.R. § 35.136(b) because the animal was out of control and maintains that Plaintiff's reasonable accommodation remains available for a different service animal. Def's Opp. at 9-10; *see* Tr. 46:17-23. Defendant is correct that service animals need not be accommodated in every instance. ADA regulations provide that a public entity may reasonably exclude a service animal if it is "out of control *and the*

---

reasonable accommodations in policies, practices, or procedures to allow service animals when necessary in order to avoid discrimination on the basis of disability, unless the entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § Pt. 35, App. A (citing 28 C.F.R. 35.130(b)(7)).

9

*animal's handler does not take effective action to control it*[.]" 28 C.F.R. § 35.136(b) (emphasis added). The regulation dictates that an animal is "under [the] handler's control" if it "ha[s] a harness, leash, or other tether . . . ." 28 C.F.R. § 35.136(d); *see also id.* § 36.302(4).

ADA regulations do not define the word "handler." Likewise, the case law sheds little insight. *See Alboniga*, 87 F. Supp. 3d at 1342 ("Unfortunately, there is very little in the way of case-law guidance as to what constitutes a 'hander' with 'control' over a service animal for purposes of these regulations."). In *Alboniga*, the court concluded that the regulations "'specifically prohibit[s] the practice of leaving a service animal unattended[]'" which implies that an animal being out of control "is its being unattended." *Id.* (quoting *Shields v. Walt Disney Parks & Resorts US, Inc.*, 279 F.R.D. 529, 547 (C.D. Cal. 2011)). "[N]ormally, tethering a service animal to the wheelchair of a disabled person constitutes 'control' over the animal by the disabled person[.]" *Id.* In *United States v. Gates-Chili Central School District* the court considered whether an eight-year-old disabled child, who needed help untethering the service dog and reminders to issue the dog commands, was sufficiently in control of the service animal. 198 F. Supp. 3d 228, 234-35 (W.D.N.Y. 2016). The court denied summary judgment because a dispute of fact remained as to whether the child could "handle" her service dog. *Id.* But the Court noted that the defendant's argument that "control" requires "much more than simply being tied to the dog" was undercut by the holding in *Alboniga. Id.*

The Department of Justice's guidance regarding service animals and the ADA indicates that the word "handler" refers not only to the disabled individual, but may also be a third party contributing to the disabled individual's and the service dog's care:

> Q9. Who is responsible for the care and supervision of a service animal?
> A. The handler is responsible for caring for and supervising the service animal, which includes toileting, feeding, and grooming and veterinary care. Covered entities are not obligated to supervise or otherwise care for a service animal.

10

> . . .
> Q27. What does under control mean? Do service animals have to be on a leash? Do they have to be quiet and not bark?
> A. The ADA requires that service animals be under the control of the handler at all times. In most instances, the handler will be the individual with a disability or a third party who accompanies the individual with a disability.

https://www.ada.gov/resources/service-animals-faqs/#:~:text=and%20not%20bark?-,A.,the%20individual%20with%20a%20disability (last accessed December 17, 2024). SCDSS has not asserted that Plaintiff's husband is not a proper handler of the service dog, in addition to Plaintiff. Plaintiff's husband contributes to the dog's care on Plaintiff's behalf – he takes the dog for walks and takes the dog to training. Reply Affidavit of Nicole Ahlschlager (Pl.'s Reply Aff."), ECF 13-1, ¶¶ 3, 8; *see* Avila Decl. ¶ 4. The Court treats Plaintiff's husband as Nightmare's handler under the facts presented in this case.

The question of control is also addressed by the regulation's Appendix. The Appendix states that "the Department [of Justice] has long held that a service animal must be under the control of the handler at all times" but notes that "there are occasions when service animals are provoked to disruptive or aggressive behavior by agitators or trouble makers[.]" 28 C.F.R. § Pt. 35, App. A. It continues:

> [M]isbehavior in response to provocation is not always unreasonable. In circumstances where a service animal misbehaves or responds reasonable to a provocation or injury, the public entity must give the handler a reasonable opportunity to gain control of the animal. Further, if the individual with a disability asserts that the animal was provoked or injured, or if the public entity otherwise has reason to suspect that provocation or injury has occurred, the public entity should take effective steps to prevent further provocation or injury, which may include asking the provocateur to leave the public entity.

11

*Id.*³  The Appendix contemplates that a dog's behavior, even a well-trained service dog, is not always predictable and consistent with the regulatory language, provides that a public entity must give the handler a reasonable opportunity to get the animal under control.  Here, counsel for SCDSS conceded that Nightmare was "clearly . . . surprised by the door opening[.]" Tr. 29:24.  And SCDSS does not claim that Plaintiff's husband failed to take control of Nightmare.  The video clearly shows that Nightmare was leashed at the time of the incident and that as soon as Nightmare lunged, Plaintiff's husband pulled back on the leash and wrapped it closer around his hand.  Accordingly, SCDSS has not adequately stated a defense under 28 C.F.R. § 35.136(b).

ADA regulations also provide that if an individual's use of a public entity's services poses a "direct threat to the health or safety of others," the individual may be excluded.  *Id.* § 35.139(a).  The Appendix provides that, by extension, if an individual's use of a service animal poses a direct threat, it may be excluded under this provision.  *Id.*  Pt. 35, App. A.; *accord Bennet v. Hurley Med. Ctr.*, 86 F. 4th 314, 327 (6th Cir. 2023).  When determining what constitutes a

> direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: [(1)] the nature, duration, and severity of the risk; [(2)] the probability that the potential injury will actually occur; and [(3)]  whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 35.139(b); *accord Bennet*, 86 F. 4th at 327.  Similarly, "A public entity may impose legitimate safety requirements for the safe operation of its services, programs, or activities.  However, the public entity must ensure that its safety requirements are based on actual risks, not

---

³ The Department of Justice guidance also states that "Under control also means that a service animal should not be allowed to bark repeatedly in a lecture hall, theater, library, or other quiet place. However, if a dog barks just once, or barks because someone has provoked it, this would not mean that the dog is out of control." https://www.ada.gov/resources/service-animals-faqs/#:~:text=and%20not%20bark?-,A.,the%20individual%20with%20a%20disability (last accessed December 17, 2024).

12

on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 35.130 (h); *Wright*, 831 F.3d at 78.

SCDSS asserts that prior to requiring Ahlschlager to remove Nightmare from the shelter, it determined that the dog posed an actual risk to other shelter residents. Affidavit of Kathleen Sampler ("Sampler Aff."), ECF 12-5, ¶ 19. However, on this record, it is not clear that SCDSS made an individualized assessment considering the factors set out in 28 C.F.R. § 35.139(b).

SCDSS argues that Nightmare poses a risk of harm in that the service dog may bite another shelter resident. The extent and severity of this harm must be viewed in light of the likelihood of its occurrence and the availability of preventative measures. SCDSS admits that Nightmare was without incident for the approximate six weeks while it was at the shelter,[4] and that Nightmare was acting in response to the "surprise[]" of the door opening towards it. Therefore, the probability of a bite is low—particularly considering the available safety precaution of muzzling the dog. Lastly, the muzzle is an available auxiliary aid that will mitigate any risk of a direct threat to the health and safety of shelter staff and residents. At oral argument on the instant motion, counsel for SCDSS repeatedly argued that "it is not reasonable for the county to assume that the muzzle will . . . be put on the dog every single time the dog [i]s out of [Plaintiff's] living space," Tr. 19:5- 7; *see id.* at 28:18-22, and because the use of the muzzle is "not in the county's control." *Id.* at 30:8. SCDSS seemed to suggest that Plaintiff would fail to comply with the muzzling rule because Plaintiff did not comply with the "Rules and Regulations" requiring her to keep the service animal with her at all times. *See* Tr. 12:21-23 (in response to the Court's question regarding the relevance of Plaintiff's violation of the "Rules and Regulations" form, defense counsel stated, "I

---

[4] *See* Tr. 32:2-6 ("THE COURT: So there for six weeks [when the service dog was residing at the shelter], you don't dispute for the six weeks there was no, sir, incident with the dog? Do you? DEFENSE ATTY: Defendant does not dispute that.").

13

am going through the rules and regs as far as the granting of the reasonable accommodation request."). SCDSS' contention that, for some unstated reason, Plaintiff cannot be expected to comply with a directive by SCDSS or a court order to muzzle the dog is entirely unfounded and speculative.

There is no basis to claim the dog is violent by nature and SCDSS has presented the Court with no facts or law as to why muzzling the dog is an unreasonable accommodation. By refusing to consider this available precaution, SCDSS failed to comply with the ADA's requirement that the public accommodation consider changes in practices or policies that would mitigate any direct threat. Compare *Tamara*, 964 F. Supp. 2d at 1085 (granting mandatory preliminary injunction to permit service dog in psychiatric hospital where (1) hospital failed to conduct individualized assessment, (2) claim that safety risk from dog's harness being used as a weapon and fear that might ensue in other patients was mere speculation; (3) particular service dog had become accustomed to agitating behavior and "loud, unstable people," and (4) reasonable accommodations were available to mitigate direct threat) with *Bennet v. Hurley Medical Cntr.*, 86 F.4th 314, 323 (6th Cir. 2023) (finding service dog properly excluded where, after two hospital patients suffered allergic reactions on the dog's first day, hospital concluded that it could not sufficiently protect patients from the dog's allergens because the accommodations necessary to prevent that risk imposed an undue burden on the hospital); and *Heimkes v. Fairhope Motorcoach Resort Condo. Owners Ass'n, Inc.*, 22-CV-448, 2023 WL 2392731 at \*4 (S.D. Ala. Mar. 6, 2023) (finding plaintiffs failed to show likelihood of success on the merits that accommodation allowing service dog into public pool area was reasonable, where multiple witnesses testified about repeated instances of dog's aggressive behaviors). "[R]efusing Plaintiff's requested accommodation if it is reasonable in favor of one the [SCDSS] prefers is akin to allowing a public entity to dictate the

14

type of services a disabled person needs in contravention of that person's own decisions regarding [her] own life and care." *Alboniga*, 87 F. Supp. 3d at 1341.

Therefore, the Court finds that Plaintiff has demonstrated a clear likelihood of success that SCDSS cannot meet its burden of persuasion that the accommodation of placing a muzzle on her service dog is unreasonable. Plaintiff has demonstrated that (1) she is disabled; (2) the SCDSS shelter is a place of public accommodation and (3) SCDSS likely discriminated against her by depriving her of her service animal.

### C. Balance of the Equities and Public Interest

The final inquiry requires the court to determine whether the balance of equities tips in Plaintiff's favor and that an injunction is in the public interest. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). Where, as here, a governmental defendant is the party opposing relief, it is appropriate to consider the third and fourth factors together. *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021).

Plaintiff argues that given the substantial hardship that loss of the dog will have on her health and wellness, "defendant's interests pale against" hers. Pl.'s MOL at 13. Plaintiff acknowledges the public interest in "ensuring the safety of all shelter residents," but that the potential risk Nightmare poses to other residents is mitigated by the use of a muzzle. *Id.* Further, Plaintiff argues that the public has a strong interest in ensuring that SCDSS complies with the mandates of the ADA. SCDSS responds that Plaintiff's interest in keeping Nightmare is outweighed by "the health and welfare of the public, in general, and the Shelter staff and residents, in particular[,]" Def.'s Opp. at 10, and risks opening DSS up to liability. *See* Tr. 30:1-13; *see also id.* 34:2-24.

15

While SCDSS has a valid interest in protecting the health and safety of shelter residents, the Court finds that the balance of equities clearly tips in favor of the Plaintiff. As discussed above, Plaintiff will suffer irreparable harm from SCDSS' refusal to allow her use of her service dog. No comparable hardship will be suffered by SCDSS by allowing Plaintiff to place a muzzle on the dog while she resides at the shelter. There is no indication in the record that SCDSS or any of its shelter residents will suffer any harm—let alone an imminent, non-speculative one—should Plaintiff be permitted to keep Nightmare at the shelter with safety precautions in place.

Finally, securing the rights of disabled individuals under the ADA is squarely in the public interest. *See New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir.2003) ("[T]he Government does not have an interest in the enforcement of an unconstitutional law."). "[N]o public interest is served by maintaining an [unlawful] policy when [lawful] alternatives are available to achieve the same goal." *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020).

**NOW, THEREFORE, IT IS HEREBY**

**ORDERED**, that defendant, John Imhof, in his official capacity as Commissioner of the SCDSS, is hereby directed to permit plaintiff Nicole Ahlschlager to keep her service dog at any SCDSS shelter where she resides, so long as the dog is muzzled when outside of Plaintiff's room, in any common areas of the shelter facility.

**IT IS FURTHER ORDERED** that, because plaintiff is proceeding *in forma pauperis*, and given that she and her family are currently experiencing homelessness, the effectiveness of this preliminary injunction is not conditioned upon the posting of a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

SO ORDERED.

Dated: December 19, 2024          /s/ Orelia E. Merchant
       Brooklyn, New York         ORELIA E. MERCHANT
       10:50 a.m.                 UNITED STATES DISTRICT JUDGE